UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

Shannon McComas,                               )
                                               )
                    Plaintiff,                 )
                                               )         1:09-cv-1540-SEB-MJD
          vs.                                  )
                                               )
Edward Brickley,                               )
                                               )
                    Defendant.

**ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

        This lawsuit arises out of a shooting that occurred in the early morning hours of

January 1, 2008.  Plaintiff Shannon McComas was arrested in connection with the

shooting and, although the charges against him were ultimately dropped, it was not before

Mr. McComas was asked to and did, in fact, resign his position with the Indianapolis

Metropolitan Police Department ("IMPD").  Mr. McComas brought this 42 U.S.C. § 1983

action against the arresting officer, Detective Edward Brickley, for false arrest in

violation of Mr. McComas's rights pursuant to the Fourth Amendment.[1]  Currently before

the Court is Defendant Brickley's Motion for Summary Judgment,  [Docket No. 42],

which, predictably Mr. McComas opposes.  For the reasons detailed herein, Defendant's

_____

        [1]Mr. McComas originally brought this lawsuit against the City of Indianapolis and police
officers Clifford Myers and Patricia Holman as well.  However, judgment in favor of these
defendants was granted pursuant to the Court's December 7, 2010 Order Granting Defendants'
Motion for Partial Judgment on the Pleadings [Docket No. 37].  At that time, the Court also
dismissed the state law claims Mr. McComas had brought against Defendant Edward Brickley.
His § 1983 claim is the sole remaining allegation in this litigation.

motion is <u>DENIED</u>.[2]

## Factual Background

Plaintiff Shannon McComas served as an IMPD patrolman for seven and a half years between August 2001 and January 2008. During that time, McComas's wife, Rachel McComas, managed a bar called Durty Nelly's Pub & Eatery ("Durty Nelly's) owned by her father and located at 2805 North Franklin Road in Indianapolis.

On New Year's Eve, December 31, 2007, and during the early morning hours of January 1, 2008, McComas had gone to Durty Nelly's to celebrate the holiday. Shannon Aff. ¶¶ 4-5. Over the course of the evening, Mr. McComas played several rounds of darts and drank at least six beers, a small glass of champagne, and consumed a couple of mixed drinks. Rachel Dep. at 23; Shannon Dep. at 83.

Shortly after 3:00 a.m., an altercation broke out among several bar patrons and the bar's security guards. After the disruption began inside of the bar, the security guards ushered everyone outside. Surveillance video reveals that one of Durty Nelly's security

_____

[2]Defendant has also filed a motion to strike Plaintiff's Sur-reply. [Docket No. 59]. Besides being untimely pursuant to S.D. Ind. L.R. 56.1(d) and Federal Rule of Civil Procedure 6(a), the vast majority of Plaintiff's sur-reply inappropriately re-hashes arguments previously advanced in his response brief. <u>Bane v. Chappell</u>, 2010 U.S. Dist. LEXIS 24665, *3 (S.D. Ind. 2010) (Surreply stricken when it "merely reiterate[d] arguments made in previous briefs, and fail[ed] to address any new evidence or objections.") Indeed, the only argument in the sur-reply that is properly "limited to . . . new evidence and objections" pursuant to Local Rule 56.1 relates to certain statements offered by Plaintiff that appeared in a newspaper article objected to by Defendant on hearsay grounds. With this single exception, given the improper use of the sur-reply brief, we did not consider it in reaching our decision on Defendant's motion for summary judgment. Defendant's motion to strike Plaintiff's sur-reply is, thus, <u>GRANTED IN PART AND DENIED IN PART</u>.

guards, Sununguro Runsununguko (referred to as "Go-Go"), utilized tasers to help control the crowd, but no bar patrons or other security guards were actually "tased." Shortly after the group of patrons had been escorted outside, shots were fired striking several bar patrons and at least one security guard, Ronnie Croom. Croom died later that morning as a result.

Various accounts recount the details of what occurred at Durty Nelly's before and after the shootings. However, as explicated below, for the limited purpose of resolving Defendant's motion, we confine our discussion to the facts, construed in the light most favorable to the non-movant Plaintiff, of which Detective Brickley was aware at the time of his alleged false arrest of Plaintiff.

Detective Brickley and other police officers responded to the call for help to IMPD and arrived at Durty Nelly's shortly after the shooting to begin their investigation. Brickley Dep. at 15. McComas was present but Det. Brickley spoke to him only briefly, if at all, that evening. Shannon Dep. at 91-92; Brickley Dep. at 17. According to Det. Brickley, Mr. McComas appeared intoxicated and belligerent. Brickley Dep. at 17-18. Mr. McComas denies that he was belligerent but admits that he did criticize the police officers for their failure to secure the crime scene and the witnesses. McComas Dep. at 104-05.

Generally speaking, Rachel and Shannon McComas cooperated with the police investigation into the shooting. Brickley Dep. at 20-21, 57. On January 1, 2008, Rachel arranged for several police officers to view portions of the video taken by Durty Nelly's

3

surveillance camera system.  Rachel Aff. ¶ 6; Rachel Dep. at 35.  The next day, January

2nd, Rachel permitted full access by the investigative officers to Durty Nelly's premises to

search for the murder weapon,  Rachel Dep. at 37, though no weapon was recovered as a

result of that search.  Id.

Over the course of the next several days, Detective Brickley interviewed Norman

Broaden, a promoter of the party at Durty Nelly's on the night of the shooting, and

Ramierez Hayes, a security guard working at the bar on the night of the party.  Based on

information provided by Hayes, Detective Brickley returned to Durty Nelly's on January

3rd where he quickly discovered and took custody of a handgun wrapped in a pillow case

located inside a fountain soda box.  Detective Brickley also reviewed the Durty Nelly's

surveillance video on January 4th.  Brickley Dep. at 23.

Statements of Norman Broaden

During a January 2, 2008 interview of Norman Broaden, who had been the

promoter of the party at Durty Nelly's the night of the shooting, Detective Brickley

learned that Broaden had observed as "Go-Go" prepared for the party.  According to

Broaden, "Go-Go" had brought a gun out of his car, had loaded it, and then returned it to

the vehicle after Broaden had advised him that it would not be needed inside the bar that

evening.  Broaden Stmt. I at 7-8.  Broaden also told Det. Brickley that, following the

shooting, he observed Ramierez Hayes, who was another security guard on duty at the

bar, carrying the same gun that he had seen earlier in "Go-Go's" possession.  Id. at 13-14.

Broaden believed it was the same gun "Go-Go" had possessed based on its appearance

4

and based on information he received later from his brother indicating that "Go-Go" had been the one firing shots.[3] Id. at 13, 16.

During a second interview with Broaden around noon January 6th, Det. Brickley was told that Broaden had heard Hayes and "Go-Go" discussing the location of the gun following the shooting. Broaden Stmt. II at 10. Broaden also told Det. Brickley that he had spoken with McComas immediately following the shooting and that he (Broaden) had told McComas that "Go-Go" had accidentally shot Croom. Id. at 11. According to Broaden, he also had told McComas that he needed to "sober up" in order to deal with the situation. Id. at 11-12. Broaden recounted that McComas did not "acknowledge" or "believe" what Broaden told him and instead had expressed unwillingness to cooperate with the police or to turn over the surveillance video to them. Id. at 12-13 ("Q: Did he say anything? A: Ah, fuck the police, I ain't telling the police shit."). Broaden also stated that he believed that McComas had allowed "Go-Go" to view the surveillance video because "Go-Go" had given "a little sigh of relief" that the details of the shooting had not been visible. Id. ("And then I think [Shannon and Rachel McComas] allowed ["Go-Go"] to look at [the surveillance tape] because he came back with a little sigh of relief like they can't see me on the camera, I already looked. . . . some things I [Broaden] won't get totally correct but some things I'm real specific with because I was watching

---

[3]Broaden also told Det. Brickley that, after speaking with his brother, Broaden advised "Go-Go" to admit his part in the shooting to the authorities. Broaden at 18-19. According to Broaden, "Go-Go" told him that he would not turn himself in because he had not meant to hurt anyone. Id. Broaden took this to be an admission of involvement on the part of "Go-Go." Id.

Go-Go to make sure he was doing everything that my brother said his character would do. He was. He fell right into character that he had done something wrong.") Broaden also claimed that he had told McComas where Hayes had told him the gun was hidden, but that McComas did not confirm that information. Id. at 13.

First Statement of Ramierez Hayes[4]

On January 3rd, Det. Brickley interviewed security guard Ramierez Hayes and learned that Hayes had been inside the bar, but near the front door when he heard shots fired. Hayes's immediate response was to run back into the kitchen, but he returned promptly to the front door of the bar once the shooting stopped. Hayes Stmt. I at 6-7. At that point, "Go-Go" handed Hayes a handgun and told him to put it in the office. Id. at 7. Hayes stated that he had seen "Go-Go" earlier with the gun attached to his vest. Id. at 13. Hayes put the gun in a drawer in the office, but "Go-Go" had told Hayes the day of the interview that he had hidden the gun elsewhere. Id. at 10-11. Hayes stated that no one else was in the office when he took the gun there to place in the drawer. He specifically stated that neither Shannon nor Rachel McComas was present at the time. Id. at 11. However, he believed that the McComases both knew that the gun had been placed there, because it was McComas's IMPD-issued gun, and it was normally kept there. Id. at 11-

---

[4]Hayes provided Det. Brickley a second statement in which he implicated McComas as having helped him dispose of the gun after the shooting. Hayes Stmt. II at 13-18. This accusation was inconsistent with Hayes's prior statement that neither Shannon or Rachel McComas was present when he brought the gun into the office after the shooting. However, as the parties acknowledge, the Hayes statement was given on January 9 – three days after McComas's arrest. Thus, it could not have informed Brickley's belief regarding McComas's involvement in any crime.

12.

Shannon and Rachel McComas came to Det. Brickley's office the evening of Sunday, January 6th, (Shannon McComas Dep. at 94), in response to Det. Brickley's call earlier that day requesting that they provide statements. During that call, Detective Brickley assured the McComases that there was no urgency in their providing statements because, after reviewing the surveillance video, he knew the McComases were not involved in the shooting.[5] Rachel Dep. at 45-46.

Shannon McComas informed Det. Brickley that he had not heard any shots fired the night of the Durty Nelly's shooting and that he had not witnessed any altercation preceding the shooting. McComas Stmt. at 4-6. Mr. McComas explained that even after seeing a man lying on the ground, he was unaware that the man had been shot thinking he merely was unconscious. Id. at 6. However, Mr. McComas also told Det. Brickley that he had directed one of the bartenders to call 911. Id. According to Mr. McComas, no one told him anything specific about the shooting the night it occurred, but he overheard someone say that a person had come from outside the bar and begun shooting at the crowd. Id. at 8. McComas initially stated that he never spoke to "Go-Go" after the shooting, Id. at 9, but later admitted he may have asked "Go-Go" what had occurred. Id. at 18-19 ("I don't recall talking to him and I can't tell you what I said to him other than what the hell happened, Go-Go. I may have said that.") McComas also told Det. Brickley

_____

[5]Det. Brickley has no specific recall of this statement but acknowledges that he may have used this technique to entice the McComases to provide statements. Brickley Dep. at 34-35.

that "Go-Go" was in possession of a taser that evening and that he (McComas) generally kept his IMPD-issued taser in his pocket,  Id.  at 6-7, 10, though he was unsure whether he did in fact have it in his pocket that evening.  Id.  at 10.  However, McComas also told Det. Brickley that he did not remove the taser from his pocket that evening because he was unaware that any altercation had occurred,  Id. at 10, and did not recall "Go-Go" having given him the taser that "Go-Go" normally carried.  Id. at 10-11.  McComas expressly denied that he had his IMPD handgun at the bar that night or ever.  Id. at 11.

At one point in the interview, Det. Brickley pressed McComas for additional information, telling McComas that, having watched the surveillance video closely, he had seen McComas carrying a handgun.  Id. at 12-15.  McComas denied ever having carried a gun that night, explaining, "No, I am not carrying a handgun.  I'm carrying my taser."  Id. at 13-15.  When questioned further about whether he had in fact handled the taser normally carried by "Go-Go," McComas admitted that his memory of what occurred that evening may have been impaired as a result of his drinking alcohol but that he did not recall doing so.[6]  Id. at 15-16.  At the conclusion of Det. Brickley's interview with McComas, McComas was arrested for murder and assisting a criminal and taken into

---

[6]Mr. McComas's story varied considerably during his deposition regarding his recollection of that evening.  He stated definitively that the object in his hand in the surveillance video was his IMPD-issued taser,  McComas Dep. at 66-67, and also explained that he remembered giving "Go-Go" this taser because the batteries had fallen out of the one "Go-Go" normally used.  Id. at 85-86.  Then, McComas testified that he took "Go-Go's" taser and used it to keep other bar patrons away from the injured individuals "Go-Go" had pulled into the bar after the shooting.  Id. at 86-89.  While these facts arguably undermine Mr. McComas's credibility, they were unknown to Det. Brickley at the time of the arrest and, thus, are irrelevant for purposes of determining whether probable cause existed to arrest Mr. McComas.

custody at the Marion County Jail. On January 7th, two IMPD officers visited McComas and told him that if he refused to voluntarily resign from the police force, he would be terminated following an emergency meeting of the Police Merit Board. McComas, thus, chose to sign the resignation letter provided by the officers. Shannon Dep. 101.

After ballistics tests results came back inconclusive, the murder charge against "Go-Go" as well as the charges against McComas were dismissed in March, 2008. Following that dismissal, McComas claims that Det. Brickley approached him to say that it had not been his decision to arrest him and that he had known that McComas was holding a taser rather than a gun in the surveillance video. Shannon McComas Dep. at 107; Rachel McComas Dep. at 48-50. McComas thereafter filed this lawsuit against Det. Brickley for false arrest.

**Legal Analysis**

**A.    Standard of Review**

Summary judgment is appropriate when the record shows that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party. <u>See</u> <u>id.</u> at 255.

However, neither the "mere existence of some alleged factual dispute between the parties," id., 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment. Michas v. Health Cost Controls of Ill., Inc., 209 F.3d 687, 692 (7th Cir. 2000).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case. Id. at 325.

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes. Waldridge v. Am. Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994). Therefore, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. See Shields Enterprises, Inc. v. First Chicago Corp., 975 F.2d 1290, 1294 (7th Cir. 1992); Wolf v. City of Fitchburg, 870 F.2d 1327, 1330 (7th Cir. 1989). But if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment is not only appropriate, but mandated. See Celotex, 477 U.S. at 322; Ziliak v. AstraZeneca LP, 324 F.3d 518, 520 (7th Cir. 2003). Further, a failure to prove one

essential element "necessarily renders all other facts immaterial." <u>Celotex</u>, 477 U.S. at 323.

**B.      Discussion**

Det. Brickley's request for summary judgment rests on two bases: First, that McComas was not falsely arrested because Det. Brickley had probable cause to arrest McComas for aiding in a murder, assisting a criminal in the commission of a murder, and false informing during the course of an official investigation; and second, that he is entitled to qualified immunity from McComas's claim because he was an official performing a discretionary function and that he reasonably believed that his actions were within the bounds of the law at the time of the incident underlying McComas's claim. We discuss each of these arguments below.

**1.      Probable Cause**

Shannon McComas has framed this action against Brickely as a 42 U.S.C. § 1983 claim for false arrest, in violation of the Fourth Amendment. However, if it can be shown that probable cause existed for the arrest, that stands as an absolute defense against such a claim. <u>Mustafa v. City of Chicago</u>, 442 F.3d 544, 547 (7th Cir. 2006). Probable cause exists if, at the time of arrest, the facts and circumstances within the defendant's knowledge are sufficient to warrant a prudent person to believe that the suspect committed an offense. <u>Stokes v. Board of Educ. of the City of Chicago</u>, 599 F.3d 617, 622 (7th Cir. 2010). In a civil suit for damages, when the question of probable cause for an arrest arises, "it is a proper issue for the jury if there is room for a difference of opinion

concerning the facts or the reasonable inferences to be drawn from them." Rising-Moore v. Wilson, 2005 U.S. Dist. LEXIS 13955, at *28 (S.D. Ind. 2005) (Barker, J.) (holding that a genuine factual dispute as to probable cause precluded granting of summary judgment). "When 'the arrestee challenges the officer's description of the facts and presents a factual account where a reasonable officer would not be justified in making an arrest, then a material dispute of fact exists,' and summary judgment is inappropriate." Id. "[A]n arresting officer's subjective knowledge of *facts* sufficient to constitute probable cause is central to evaluation of the propriety of an arrest," but the officer's theory of the *legal basis* for the arrest is unimportant. Richardson v. Bonds, 860 F.2d 1427, 1430 (7th Cir. 1998). "An arrest is reasonable under the Fourth Amendment so long as there is probable cause to believe that *some* criminal offense has been or is being committed, even if it is not the crime for which the officers initially charged the suspect." Jackson v. Parker, 2010 U.S. App. LEXIS 24683 at *11 (7th Cir. Dec. 3, 2010)(quoting Fox v. Hayes, 600 F.3d 819, 837 (7th Cir. 2010)).

Thus, in determining whether Det. Brickley had probable cause to arrest McComas, we evaluate the facts known to him as of the time of McComas's arrest on the evening of January 6, 2008 to determine whether, as a matter of law, those facts warranted a belief that McComas committed a criminal offense. The parties have arranged their briefs in terms of criminal offenses for which Det. Brickley argues he had probable cause to arrest McComas, namely, murder and assisting a criminal, and false informing. Thus, our analysis will also track that format.

### a.    Murder and Assisting a Criminal

In Indiana, the crime of murder is defined as the knowing or intentional killing of another human being.  Ind. Code § 35-42-1-1(1).  An accomplice to murder, one "who knowingly or intentionally aids, induces, or causes another person to commit an offense," is equally as culpable as the one who commits the actual crime.  Ind. Code § 35-41-2-4.

Det. Brickley argues that the following facts known to him at the time he arrested McComas establish, as a matter of law, the existence of probable cause to believe that McComas had assisted "Go-Go" in the murder of Ronnie Croom:

- surveillance video showing McComas carrying an object that appeared to be a gun.  P.C. Aff. at 10; Brickley Dep. at 36, 40-41.

- surveillance video showing McComas carrying "Go-Go's" taser shortly before the shooting took place.  P.C. Aff at 10.

- statement of Norm Broaden suggesting that McComas would try to hinder the police investigation by trying to hide valuable evidence or refusing to provide police with the surveillance video implicating "Go-Go."  P.C. Aff. at 8, Broaden Statement II at 12-13.

We disagree with Det. Brickley's assertion that under these facts no reasonable jury could find that he lacked probable cause to arrest McComas.  The object in McComas's hand in the surveillance video is unidentifiable (at least to an untrained eye).  Although Det. Brickley may, as he testified, have believed that the object was a gun, this bolstering testimony does not suffice to establish, as a matter of law, the existence of

13

probable cause to arrest McComas, especially in light of McComas's testimony that Det. Brickley had admitted to him that he had, in fact, not believed the object in the video was a gun. Shannon McComas Dep. at 107; see also Rachel McComas Dep. at 48-50. Det. Brickley asserted in his reply brief that in deciding whether probable cause existed he took into account "other behavior" by McComas that informed his conclusion that the object was a gun, specifically, that McComas appeared to "press check" a handgun. However, this evidence provides little more than corroboration of the lack of clarity in the video. We are left to wonder how Det. Brickley could have observed the supposed "press check" if, as Det. Brickley states in his reply brief, it occurred when McComas pulled the object in front of him (and out of the view of the video camera, which shows a view of McComas's back) suggesting the clear need for a jury to resolve the factual discrepancies. Camera 2, Backdoor, 3:19.

Det. Brickley maintains that the "likely path" of the gun "from the office, to the shooting out front, and then back to the office," also informed his belief that what he saw in the video was McComas carrying a gun. Essentially, Det. Brickley's argument is that, although the object in McComas's hand is unidentifiable and no exchange between "Go-Go" and McComas was viewable on camera, he nonetheless believed that McComas had provided "Go-Go" with a gun because: (1) McComas is seen carrying an object out of the office and into the kitchen, (2) "Go-Go" is seen entering the kitchen with a taser shortly thereafter, (3) "Go-Go" leaves the kitchen and walks outside where the shots are fired, at which time the taser he previously held cannot be seen, and (4) Hayes admitted that he

returned the gun to the office. However, as McComas points out, the object visible in "Go-Go's" hand at 3:22 (after the point at which Det. Brickley apparently believed the "exchange" to have taken place) was obviously a taser because it is emitting sparks in the surveillance video. Camera 6, Front Door, 3:22; Shannon Aff. ¶ 8. Furthermore, Det. Brickley's "likely path" explanation may be eroded if the jury chooses to believe Broaden's statement to Det. Brickley that he had seen "Go-Go" with a gun earlier in the evening that had come from his car. Broaden Stmt. I at 7-9, 13-14. See, e.g., Fox v. Hayes, 600 F.3d 819, 834 (7th Cir. 2010) ("the probable cause standard [does not] allow the defendants to rely on facts without regard to the full context of the circumstances known to them.") We find that the contradictory interpretations of the video in terms of what it does or does not reveal and the conflicting inferences arising from it present issues necessitating a jury's resolution.

The statements of Norm Broaden do not overcome the above conflicts in the evidence or permit a finding, as a matter of law, of probable cause to arrest Mr. McComas. Broaden told Det. Brickley that he had told McComas that "Go-Go" was responsible for the shooting. However, Broaden also specifically stated that McComas did not acknowledge or believe that account. Broaden Stmt. II at 11-12. Det. Brickley's reliance on Broaden's statement that McComas, on the night of the shooting, had remarked that he did not intend to cooperate with police or to provide them with the surveillance video does not buttress a probable cause finding because, as Det. Brickley admitted in his deposition, McComas had not hindered his investigation or impeded his

access to the surveillance video in any way. Broaden Stmt. II at 12-13; Brickley Dep. at 57. Indeed, Det. Brickley testified that he had observed the tape on January 4 – two days prior to Broaden's statement. Brickley Dep. at 23. Although probable cause can be established by witness statements that later prove to be false, there must be some indication that the witness's initial statement is reliable. See Holmes v. Village of Hoffman Estates, 511 F.3d 673, 680 (7th Cir. 2007). Here, Det. Brickley knew at the time he decided to place McComas under arrest that McComas and his wife had been cooperative with his investigation, whether McComas had made prior statements to Broaden to the contrary or not. Thus, Broaden's statements do not suffice to permit a finding of probable cause as a matter of law or as a matter of fact.

### b. False Informing

Det. Brickley next argues that he had probable cause to arrest McComas for false informing. In Indiana, false informing is defined as "giv[ing] false information in the official investigation of the commission of a crime, knowing the report or information to be false." Ind. Code § 35-44-2-2(d).

Det. Brickley maintains that the following evidence supports a finding of probable cause to arrest McComas for false informing[7]:

_____

[7]In his opening brief, Det. Brickley argued that he had probable cause to arrest McComas for false informing because McComas was untruthful when he denied being aware of the shooting in part because, according to Det. Brickley, McComas flinched at the time shots were fired. However, in his reply brief, which was filed well after McComas designated the surveillance video, Det. Brickley admits that the video does not show McComas "flinching" at the time of the gunfire and, thus, he has withdrawn this argument. Def.'s Reply at 7.

- McComas denied speaking with "Go-Go" after the shooting but Det. Brickley had witnessed the two conversing at the scene. Compare McComas Stmt. at 9, 18-19 and Brickley Dep. at 38-39.

- McComas denied having any weapon on the night of the incident, including his IMPD issued taser, McComas Stmt. at 10-11, 15, 20; however, the video surveillance showed McComas holding a weapon of some sort. P.C. Aff. at 10, Brickley Dep. at 40.

- Broaden told Det. Brickley that McComas was aware of "Go-Go's" involvement in the shooting and that McComas had stated his intention to withhold surveillance video from the police. Broaden Stmt. at 12-13.

We have noted previously that Broaden's statements about Mr. McComas's unwillingness to cooperate with police were contradicted by Mr. McComas's and his wife's cooperation and voluntarily surrender of the surveillance video to police, of which Det. Brickley was aware prior to his decision to arrest McComas. Furthermore, as McComas points out, Broaden expressly stated to Det. Brickley that McComas did not acknowledge or believe Broaden's statement that "Go-Go" had shot Croom. Broaden at 12. The other grounds on which Det. Brickley relies as support for his conclusion that Mr. McComas had provided false information require credibility determinations that are improper for the Court to make at this stage in the litigation. For example, Det. Brickley invites us to credit his testimony over Mr. McComas's on the issue of whether McComas

spoke to "Go-Go" in the aftermath of the shooting. Such a credibility determination is beyond our power on summary judgment. Further, as discussed above, the precise identity of the object in Mr. McComas's hand as shown in the video remains unidentifiable and as such it is a question for the jury as is the issue of the reasonableness of Det. Brickley's inference that it was a gun.[8]

### 2. Qualified Immunity

As previously noted, Det. Brickley also asserts a qualified immunity defense to McComas's § 1983 claim as an alternative basis for summary judgment. Even if an officer is found to have lacked probable cause to arrest an individual, qualified immunity may still protect the officer from liability if it was objectively reasonable for the officer to believe that probable cause existed in the particular circumstances. Humphrey v. Staszak, 148 F.3d 719, 725 (7th Cir. 1998); See also Berry v. Lindenman, 2004 U.S. Dist. LEXIS

---

[8]Not until his reply brief does Detective Brickley first contend that he had probable cause to believe Mr. McComas had assisted in "Go-Go's" criminal recklessness at the time of McComas's arrest. Def.'s Reply at 16-18. This new argument is based on the theory that assuming Mr. McComas provided "Go-Go" with a taser (as opposed to a gun or nothing, which is what the surveillance video reveals), Mr. McComas could have been charged with having assisted in "Go-Go's" "jumping into a crowd and firing an IMPD-issued taser wildly" thereby threatening to harm individuals in the crowd. Following Seventh Circuit directives, "[w]hile an objective standard is to be employed in assessing the legal basis for an arrest, we will not 'indulge in ex post facto extrapolations of all crimes that might have been charged on a given set of facts at the moment of the arrest . . . . Such an exercise might permit an arrest that was a sham or fraud at the outset, really unrelated to the crime for which probable cause to arrest was actually present[,] to be retroactively validated.'" Richardson v. Bonds, 860 F.2d 1427, 1431 (7th Cir. 1988)(citation omitted). Any recklessness with a taser on the part of "Go-Go" is completely unrelated to the crimes that Det. Brickley has, until this belated point, maintained that he believed had been committed by Mr. McComas. Thus, we reject this new hypothetical justification for Mr. McComas's arrest.

16407, at*10 (N.D. Ill. 2004)(stating that "qualified immunity protects police officers even if they make a reasonable mistake as to the existence of probable cause"). "At the summary judgment stage in § 1983 actions where the plaintiff has alleged a violation of the Fourth Amendment, the qualified immunity question is closely related, though not identical, to the question on the merits: whether the plaintiff has raised a triable issue regarding the constitutional violation." Phelps v. City of Indianapolis, 2004 U.S. Dist. LEXIS 9151, at *35-36 (S.D. Ind. 2004).

The doctrine of qualified immunity protects government officials from liability for civil damages so long as their conduct does not violate clearly established statutory or constitutional rights reasonably knowable at the time of the conduct. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Because qualified immunity provides an immunity from suit rather than a mere defense to liability, it is properly assessed at the summary judgment stage. See Purtell v. Mason, 527 F.3d 615, 621 (7th Cir. 2008).

The Supreme Court has developed a two-part test to determine whether a government official is entitled to qualified immunity in a civil suit under § 1983. Saucier v. Katz, 533 U.S. 194, 200-01(2001). First, the court must determine whether the facts, when construed in the light most favorable to plaintiff, demonstrate a constitutional violation. Id. at 201. If such a violation has been established by the facts, the court must determine whether the law was "clearly established" at the relevant time. Id.

Summary judgment based on qualified immunity must be denied where "'legal question of immunity is completely dependent upon which view of the facts is accepted

by the jury.'" <u>Estate of Bryant By Bryant v. Buchanan</u>, 883 F. Supp. 1222, 1227 (S.D. Ind. 1995) (Barker, C.J.) (quoting <u>Adams v. Metiva</u>, 31 F.3d 375, 387 (6th Cir. 1994)). "Summary judgment is not appropriate if there are factual disputes involving an issue on which the question of immunity turns such that it cannot be determined before trial whether the defendant did acts that violate clearly established rights.'" <u>Pray v. City of Sandusky</u>, 49 F.3d 1154, 1160-1161 (6th Cir. 1995) (<u>quoting</u> <u>Poe v. Haydon</u>, 853 F.2d 418, 426 (6th Cir. 1988), cert. denied, 488 U.S. 1007 (1989)); <u>see</u> <u>also</u> <u>Green v. Carlson</u>, 826 F.2d 647, 652 (7th Cir. 1987) (holding "if there are issues of disputed fact upon which the question of immunity turns, . . . the case must proceed to trial"); <u>Estate of Gregory J. Palma v. Edwards</u>, 2001 U.S. Dist. LEXIS 24561, 2001 WL 1104716 at 3 (N.D. Ill. 2001) (noting that "summary judgment based on qualified immunity is not proper when the question of immunity turns on issues of disputed fact").

A plaintiff bears the burden of establishing that the right he claims was violated was clearly established. <u>Kernats v. O'Sullivan</u>, 35 F.3d 1171, 1176 (7th Cir. 1994). This is "a rather heavy burden, and appropriately so because qualified immunity is designed to shield from civil immunity all but the plainly incompetent or those who knowingly violate the law." <u>Donovan v. City of Milwaukee</u>, 17 F.3d 944, 952 (7th Cir. 1994)(quotation marks omitted) (citations omitted). Ordinarily, to overcome this burden, a plaintiff must cite to a "closely analogous case" establishing that he had a constitutional right to be free of the defendant's actions. Here, Mr. McComas has cited to no such case. Thus, qualified immunity will be deemed to bar his lawsuit unless he can show that Det.

Brickley's decision to arrest him was "so egregious that no reasonable person could have believed that it would not violate clearly established rights." Smith v. City of Chicago, 242 F.3d 737, 742 (7th Cir. 2001).

Establishing the reasonableness of an officer's decision to arrest in a particular case requires factual development. See Chelios v. Heavener, 520 F.3d 678, 692 (7th Cir. 2008). "Thus, 'if the facts draw into question the objective reasonableness of the police action under the alleged circumstances, they must be developed in the district court before a definitive ruling on the defense can be made.'" Id. (quoting Clash v. Beatty, 77 F.3d 1045, 1048 (7th Cir. 1996)).

In Clash v. Beatty, the plaintiff (arrestee) brought an excessive force claim. In that case, the arresting officer had approached the plaintiff's vehicle following reports from witnesses that children in the vehicle were playing with a gun in a threatening manner. Although the officers discovered that the gun was a toy, they nevertheless arrested plaintiff and shoved him into their police vehicle. The Seventh Circuit affirmed a denial of qualified immunity finding that a trial was required before the district court could determine whether the officer should "have known in the circumstances presented that the shove was 'plainly excessive.'" Clash, 77 F.3d at 1048. Similarly, in Chelios v. Heavener, the Seventh Circuit reversed a district court's grant of qualified immunity where the parties disputed whether and to what degree the plaintiff (arrestee) "had become agitated and threatening in speaking to [the arresting officer]," the level of chaos at the scene at the time of the arrest, the exact sequence of events leading up to the arrest,

and whether the arrestee had, in fact, made physical contact with the arresting officer. Chelios, 520 F.3d at 692. The Court of Appeals found in that case that a trial was required before a qualified immunity determination was possible. Id.

Based on our analysis of Mr. McComas's claim and the holdings of the Court of Appeals in Clash and Chelios, we conclude that a trial must occur to resolve the facts relating to the objective reasonableness of Det. Brickley's decision to arrest McComas. Whether Det. Brickley's suspicions of criminal activity of some sort on the part of Mr. McComas were reasonable based on the surveillance video and the statements of Norm Broaden and Ramierez Hayes cannot be determined as a matter of law. Furthermore, a jury must evaluate the credibility of Mr. McComas's factual recounting of Det. Brickley's admission that he knew the object in Mr. McComas's hand was not a gun. These disputes foreclose a finding that Det. Brickley's arrest of McComas was consistent with Fourth Amendment standards.

## Conclusion

For the reasons explained above, we find that genuine issues of material fact remain with regard to Mr. McComas's § 1983 claim and that qualified immunity cannot shield Detective Brickley from possible liability. Thus, Detective Brickley's Motion for Summary Judgment [Docket No. 42] is DENIED.

IT IS SO ORDERED.

Date: _____05/13/2011_____

_Sarah Evans Barker_

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Jennifer Lynn Haley
CITY OF INDIANAPOLIS, CORPORATION COUNSEL
jhaley@indy.gov

Jeffrey S. McQuary
BROWN TOMPKINS LORY
jmcquary@brown-tompkins-lory.com

Alexander Phillip Will
OFFICE OF CORPORATION COUNSEL
awill@indygov.org